## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Gainesville Division

| | | |
|---|---|---|
| JEFF GRUVER, EMORY MARQUIS "MARQ" MITCHELL, BETTY RIDDLE, KRISTOPHER WRENCH, KEITH IVEY, KAREN LEICHT, RAQUEL WRIGHT, STEVEN PHALEN, CLIFFORD TYSON, JERMAINE MILLER, FLORIDA STATE CONFERENCE OF THE NAACP, ORANGE COUNTY BRANCH OF THE NAACP, AND LEAGUE OF WOMEN VOTERS OF FLORIDA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Complaint** |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | No: _____ |
| KIM A. BARTON, in her official capacity as Supervisor of Elections for Alachua County, PETER ANTONACCI, in his official capacity as Supervisor of Elections for Broward County, MIKE HOGAN, in his official capacity as Supervisor of Elections for Duval County, CRAIG LATIMER, in his official capacity as Supervisor of Elections for Hillsborough County, LESLIE ROSSWAY SWAN in her official capacity as Supervisor of Elections for Indian River County, MARK EARLEY in his official capacity as Supervisor of Elections for Leon County, MICHAEL BENNETT, in his official capacity as Supervisor of Elections for Manatee County, CHRISTINA WHITE, in her official capacity as Supervisor of Elections for Miami-Dade County, BILL COWLES, in his official capacity as Supervisor of Elections for Orange County, RON TURNER, in his official capacity as Supervisor of Elections for Sarasota County, and LAUREL M. LEE, in her official capacity as Secretary of State of the State of Florida, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

This lawsuit challenges Florida's new law, SB7066, which unconstitutionally denies the right to vote to returning citizens with a past felony conviction based solely on their inability to pay outstanding fines, fees, or restitution.[1] Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      On November 6, 2018, a supermajority of nearly 65 percent of Florida voters—more than 5 million people—approved one of the largest expansions of voting rights in the United States since the passage of the Voting Rights Act of 1965. In enacting the Voting Restoration Amendment, known as Amendment 4, voters revised the Florida Constitution to abolish permanent disenfranchisement of nearly all citizens convicted of a felony offense. Amendment 4 automatically restored voting rights to over a million previously disenfranchised Floridians who had completed the terms of their sentences including parole or probation—ending a broken system that disenfranchised more than 10 percent of *all* of the state's voting-age population and more than 20 percent of its African American voting-age population, *Hand v. Scott*, 285 F. Supp. 3d 1289, 1310 (N.D. Fla. 2018). Its passage was a historic achievement for American

---

[1] This document refers to persons with felony convictions as "returning citizens" throughout.

democracy and made clear that Florida voters intended to end lifetime disenfranchisement and give their fellow citizens a voice in the political process.

2.    Florida's prior disenfranchisement provision originated in the 1860s, as part of Florida's prolonged history of denying voting rights to Black citizens and using the criminal justice system to achieve that goal. From the shadow of that history, voters overwhelmingly chose to expand the franchise to persons previously excluded. Floridians recognized, as the United States Supreme Court has, that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

3.    This action challenges the attempt by certain Florida lawmakers to vitiate Amendment 4's enfranchising impact by making restoration of voting rights contingent on a person's wealth. Amendment 4's language is clear and simple— individuals with a conviction for any felony other than murder or a sexual offense will have their voting rights "restored upon completion of all terms of sentence including parole or probation." Yet, on June 28, 2019, Governor Ron DeSantis signed legislation—which the Senate and House ultimately passed along party line votes—that attempts to drastically claw back the voting rights conferred by Amendment 4 and retract Plaintiffs' right to vote. SB7066 provides that returning

citizens are not eligible to register or vote until they settle *any* form of legal financial obligation ("LFO") that arises from their conviction—even if those returning citizens will never be able to pay outstanding balances, and even where their outstanding debt has been converted to a civil lien.

4.      SB7066 conditions Plaintiffs' right to vote on their wealth and penalizes returning citizens who are unable to pay, in violation of the First, Fourteenth, Fifteenth, and Twenty-Fourth Amendments and the Ex Post Facto Clause of the U.S. Constitution. If not enjoined, the law will have a massive disenfranchising effect, and result in sustained, and likely permanent, disenfranchisement for individuals without means.[2] It creates two classes of returning citizens: those who are wealthy enough to vote and those who cannot afford to. This disenfranchisement will be borne disproportionately by low-income individuals and racial minorities, due to longstanding and well-documented racial gaps in poverty and employment.

---

[2] The Florida Clerk of the Courts Association anticipates that 83 percent of all legal financial obligations will remain unpaid, due to the payor's financial status. *See* Daniel Rivero, *Felons Might Have to Pay Hundreds of Millions Before Being Able to Vote in Florida*, WLRN Public Radio and Television (Jan. 20, 2019), https://www.wlrn.org/post/felons-might-have-pay-hundreds-millions-being-able-vote-florida. Similarly, the Florida Circuit Criminal Courts failed to collect nearly 80 percent of all fines and fees in 2018. Fines & Fees Justice Center, *Annual Assessments and Collections Report [Florida, 2013-2018]* (Sep. 30, 2018) https://finesandfeesjusticecenter.org/articles/annual-assessments-and-collections-report-florida-2013-2018/.

5.      SB7066 is further unlawful because it was motivated, at least in part, by a racially discriminatory purpose. It is well-established that people with felony convictions in Florida are disproportionately Black—a product of higher rates of police stops, arrest, prosecution, and conviction of Black citizens in the criminal justice system. It is also well-established that a large majority of returning citizens have LFOs they cannot pay now or in the foreseeable future. In addition, Black Floridians with a felony conviction face intersecting barriers to paying off their LFOs due to hurdles to employment and long-standing racial disparities in wealth and employment across the state. Yet, notwithstanding this disproportionate impact on Black returning citizens, before SB7066 was enacted, lawmakers expressly refused to consider evidence about the racial and socioeconomic impacts of the law and the foreseeable harm to Black communities, and rejected ameliorative amendments that they were advised could have lessened the law's impact on Black returning citizens. There is a strong inference that the law was motivated by discriminatory purposes in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution in light of: the history of racial discrimination underlying Florida's felony disenfranchisement regime; the sequence of events and procedural irregularities leading to SB7066's enactment; the reasonably foreseeable and known discriminatory impact; and the tenuousness of the stated justifications for SB7066.

6.     SB7066 will also prevent or at least chill voter registration and voting among returning citizens because Florida has no unified system to accurately record data on LFOs, and no system to access data on federal or out-of-state financial obligations, leaving returning citizens without any reasonable or accessible method of determining if they would violate the law by registering to vote, or means to defend against challenges to their eligibility to vote based on LFOs. Such a scheme violates the Fourteenth Amendment of the U.S. Constitution.

7.     SB7066 will also significantly impede organizational Plaintiffs' ability to engage in voter registration activities and thus directly burdens fundamental First Amendment speech and associational rights, which are inseparable and intertwined aspects of those activities. Organizational Plaintiffs' members and volunteers must hesitate in conducting their core voter registration activities due to the risk of creating legal liability for returning citizens who have no means to determine whether their LFOs would make them ineligible to register. As a result, members have been deterred from registering voters. The need to inquire into the status of potential applicants' LFOs has undermined the feasibility of organizational Plaintiffs' voter registration drives.

8.     Floridians spoke loud and clear last November by amending their constitution by citizen initiative, "the most sacrosanct of all expressions of the people," *Fla. Hosp. Waterman, Inc. v. Buster*, 984 So. 2d 478, 485–86 (Fla. 2008).

It was regularly reported that Amendment 4 would restore voting rights to roughly 1.4 million people in Florida, reflecting the public's understanding that restoration of voting rights would not be contingent on one's wealth.

9.      SB7066 reinstates a system of lifetime disenfranchisement for a large number of returning citizens—imposing precisely the unjust system that Floridians overwhelmingly rejected through Amendment 4. The Florida Legislature's attempt to retract voting rights and revert to a system of permanent disenfranchisement for the large class of citizens who cannot afford to pay LFOs—and who are disproportionately people of color—is an affront to the U.S. Constitution. It cannot stand.

## **PARTIES**

10.     Plaintiff JEFF GRUVER is a U.S. citizen and Florida resident. Mr. Gruver, a 33-year-old white man, works at Grace Marketplace, a facility for the homeless in Gainesville, where he is the director of shelter services assisting shelter residents to access treatment, employment, and permanent housing. He just completed his first semester of a Master of Social Work degree at Florida State University. Nearly ten years ago, Mr. Gruver was struggling with addiction. He was convicted of possession of cocaine in 2008 and was assessed $801 in LFOs—including a court attorney and indigent application fee, court costs, and a fine. Mr. Gruver is unable to pay his outstanding LFOs. Mr. Gruver's voting rights were

restored on January 8, 2019, by operation of Amendment 4. He registered to vote on February 19, 2019, and voted in the Gainesville regular election in March 2019. Mr. Gruver is worried that he will lose his right to vote, and that he might be removed from the voter registration rolls because of his inability to pay his outstanding LFOs.

11.     Plaintiff EMORY MARQUIS "MARQ" MITCHELL is a U.S. citizen and Florida resident. Mr. Mitchell, a 29-year-old Black man, is the president and founder of Chainless Change Inc., a non-profit organization that is committed to reducing recidivism by providing resources and support to individuals and families who are impacted by the criminal justice system. Additionally, Mr. Mitchell serves as: a trained Peer Support Specialist at the South Florida Wellness Network, which assists young people and families with co-occurring disorders; a mentor with an employment-readiness nonprofit; and a member of two subcommittees on the Broward County Reentry Coalition. Mr. Mitchell devotes significant time and resources to his public interest endeavors, for which he does not receive a salary. He recently qualified for food assistance benefits. Mr. Mitchell grew up in the foster care system and was in and out of Department of Juvenile Justice custody after the age of twelve. He was convicted of felony escape from a Department of Juvenile Justice facility for an offense he committed at the age of sixteen. He was sentenced to 8 months and 1 day in jail.

Weeks after aging out of the foster-care system, he went on to attend Florida Memorial University. At twenty-one, he was convicted of battery, a third-degree felony, arising out of an incident in which he was abused by campus security officers while he was a student. Mr. Mitchell had his voting rights restored on January 8, 2019, by operation of Amendment 4. He registered to vote in Broward County on March 9, 2019. Mr. Mitchell has outstanding LFOs stemming from his two felony convictions—a combination of court costs and fines—in the amount of $2,143. He was unaware of his court costs and fines until he received a notice from the Miami-Dade Clerk of Court earlier this year, soon after registering to vote. Mr. Mitchell fears he might be removed from the registration rolls and denied the right to vote because he is unable to pay his outstanding LFOs.

12.     Plaintiff BETTY RIDDLE is a U.S. citizen and Florida resident. Ms. Riddle is a 61-year-old Black woman. She is mother to four adult children, grandmother to twenty-four grandchildren, and great-grandmother to eight. She works as a communications assistant for the Public Defender of Sarasota. She dropped out of high school at the age of sixteen, and was convicted of a felony in at the age of seventeen. She spent 22 years caught in a cycle of addiction that led her to a series of convictions, mostly for possession of controlled substances and offenses related to supporting her conviction. At the age of fifty-two, in recovery from her addiction, Ms. Riddle went back to school, earning a degree from the

State College of Florida. On January 8, 2019, she became eligible to register to vote for the first time in her life. She was one of the first people to submit her registration form to the Sarasota Supervisor of Elections on January 8, and is now registered to vote. Having her citizenship recognized was one of the proudest moments of her life, and she celebrated the occasion with her daughter. Ms. Riddle still has over $1,000 in outstanding court costs and fees. Because she cannot afford to pay her LFOs, Ms. Riddle fears that she might be removed from the voter registration rolls and deprived of her first opportunity to cast a ballot in Florida, where she has lived her entire life.

13.     Plaintiff KAREN LEICHT is a U.S. citizen and Florida resident. Ms. Leicht, a 62-year-old white woman, lives in Miami-Dade County, where she works full-time as a senior paralegal at a civil rights law firm that specializes in disability rights work. She is also the main caregiver for her mother, who suffers from Parkinson's disease. On April 7, 2010, she pled guilty to conspiracy to commit insurance and wire fraud and provided substantial assistance to prosecutors in the case. The court sentenced her to a term of incarceration and ordered her to pay $59,136,990.19 in restitution, which includes the full judgment of restitution ordered against her ten co-defendants—who are jointly and severally liable—even though she played only a minor role in the crime. She fulfilled all terms of probation and was released from supervision on January 1, 2013. Within one week

of being transferred from federal prison to a Miami-based residential reentry facility, Ms. Leicht had secured full-time employment at her law firm, where she has worked full-time ever since. Ms. Leicht dutifully makes monthly restitution payments towards the shared $59 million obligation, but has no ability to satisfy the outstanding amount in her lifetime. Ms. Leicht's voting rights were restored pursuant to Amendment 4 on January 8, 2019. On April 29, 2019, she registered to vote.

14.     Plaintiff KEITH IVEY is a U.S. citizen and Florida resident. Mr. Ivey, a 46-year-old Black man, lives in Jacksonville, Florida, where he manages a car dealership, supervising some 10–20 people he contracts with at his business. He qualified for early release after serving eight-and-a-half years of a ten-year sentence for violating Florida's RICO statute. Even while still incarcerated, Mr. Ivey was a part of a Duval County entrepreneurship and mentorship program, and while at the Transition House in Kissimmee, Florida, he was elected Community Coordinator at the facility. One week after he was released from prison, Mr. Ivey had already enrolled in community college, before beginning his current role managing the car dealership in Jacksonville. Mr. Ivey has conducted speaking engagements to motivate and connect with at-risk youth in Florida and wants to help fellow returning citizens become productive members of society as he has done for himself. He had no probation or parole associated with his sentence, but

has $400 in outstanding costs from more than 15 years ago. Mr. Ivey was not even aware of these costs until a reporter notified him of them in 2019. Mr. Ivey's voting rights were restored pursuant to Amendment 4 on January 8, 2019. He registered to vote on that day and, as a registered voter, subsequently voted on two occasions: once in the March 2019 Duval County election and then in the May 2019 runoff election.

15.     Plaintiff KRISTOPHER WRENCH is a U.S. citizen and Florida resident. Mr. Wrench, a 42-year-old white man, has struggled with addiction and has been convicted of felony offenses for acts related to his addiction, such as possession of controlled substances and driving with a suspended license. He has been in recovery, and sober, since January 4, 2012. He is now a productive member of his community and takes twelve-step programs into prisons to support those who are still struggling with addiction. Mr. Wrench attended Santa Fe College, where he studied for a degree in bio-medical engineering technology. He works as a painter while his wife is studying for her master's degree. They are expecting their first child later this year. His voting rights were restored on January 8, 2019, by operation of Amendment 4. He submitted an online voter registration application and was registered to vote in Alachua County on May 4, 2019. Mr. Wrench owes approximately $3,000 in court costs and fines, as a result of his past convictions. Mr. Wrench fears he might be removed from the Alachua County

voter registration rolls or denied the right to vote because he is unable to pay his outstanding costs and fines.

16.    Plaintiff RAQUEL L. WRIGHT is a U.S. citizen and Florida resident. She is a 44-year-old Black woman and mother to a 13-year-old daughter. Ms. Wright works part-time as a legal assistant to the Special Counsel to the Florida State Conference of the NAACP and part-time as the Assistant Secretary of the Indian River County Branch of the NAACP. She has a college degree, student loan and other debt, and aspires to go to law school. She was convicted of drug trafficking in 2011. Before this conviction, Ms. Wright had been a teacher for more than 14 years. Following her conviction, the State of Florida permanently revoked her teaching certificate and prohibited Ms. Wright from teaching in a Florida public school. After completing the first seven months of her sentence in prison, Ms. Wright served the remaining twenty-two months on a work-release program. During such time, she tutored more than 80 women who passed their GED exams. On January 8, 2019, Ms. Wright's voting rights were automatically restored through operation of Amendment 4. Soon thereafter, Ms. Wright registered to vote at the Indian River County Supervisor of Elections Office. Having her voting rights restored has been one of her proudest accomplishments. Ms. Wright has outstanding LFOs stemming from her sole felony conviction—a combination of court costs and a fine that has been converted to a civil lien—in the amount of at

least $50,000. Because of Ms. Wright's inability to fully pay these monetary obligations, she fears she might be removed from the voter registration rolls and barred from participating in the democratic process. Ms. Wright wishes to vote in future elections to have a voice in who represents her, to illustrate to her daughter the importance of political participation, and to exercise a fundamental right of American citizenship.

17.     Plaintiff STEVEN PHALEN, a 36-year-old white man, is a U.S. citizen and Florida resident. In 2005, Mr. Phalen resided in Wisconsin and was convicted of arson and public endangerment by a Wisconsin state court. The court sentenced him to a term of probation and payment of approximately $150,000 in restitution and court costs and fees, of which he still owes approximately $110,000. Since that time, Mr. Phalen has earned a Ph.D. in organizational and relational communication and established his career doing HVAC logistics for a multinational manufacturer and distributor. In 2015, he moved with his wife to Florida. On November 18, 2017, a Wisconsin court discharged Mr. Phalen from supervision and converted his outstanding LFOs to civil liens. Wisconsin restores voting rights to its residents with a past conviction upon completion of their supervision, irrespective of their outstanding financial obligations. As a Florida resident, Mr. Phalen had his rights restored on January 8, 2019, when Amendment 4 became effective. He registered to vote on February 26, 2019. Mr.

Phalen makes monthly payments towards his outstanding LFOs, but cannot afford to complete payment at present. He fears he might be removed from the registration rolls as a result of SB7066.

18. Plaintiff CLIFFORD TYSON is a U.S. citizen and Florida resident. He is a 62-year-old Black man and a Pastor. He has been convicted of three felonies related to theft or robbery— in 1978, he was sentenced to a 15-year term of probation and ordered to pay $2.00 in court costs and $10.00 per month towards the cost of his supervision; in 1997, he was ordered to pay $1,337.94 in restitution and $259.00 in court costs and fees; and in 1998, he was sentenced to a period of community control and probation and ordered to pay $530 in restitution, along with court costs and fees that appear to total to $661.00 (records of the costs and fees assessed for Pastor Tyson's 1998 conviction are difficult to parse, particularly because two Hillsborough County records reflect differing amounts). He fulfilled all terms of community control and probation and was released from supervision on October 6, 2003. Pastor Tyson is a productive member of his community and provides pastoral care in prisons across the state. His voting rights were restored on January 8, 2019, by operation of Amendment 4. He registered to vote that day in Hillsborough County and, as a registered voter, subsequently voted on two occasions: March 3, 2019 and April 23, 2019. Pastor Tyson has paid off his restitution obligations, but is unable to pay the costs imposed as part of his felony

sentences. He was unaware those costs remained unpaid until he was notified by counsel, and it is unclear from records or officials how much he actually has outstanding. Because of Pastor Tyson's inability to fully pay these monetary obligations, he fears he might be removed from the voter registration rolls or denied the right to vote.

19.     Plaintiff JERMAINE MILLER is a U.S. citizen and Florida resident. He is a 28-year-old Black man, community advocate, and graduate of Tallahassee Community College. Mr. Miller was convicted of a robbery and trespass in 2015, sentenced to prison, followed by a term of probation, and ordered to pay $223.80 in restitution and $1,221.25 in court costs and fines. Mr. Miller's probation was terminated on October 31, 2016. His voting rights were restored on January 8, 2019, by operation of Amendment 4. Mr. Miller registered to vote in Leon County on January 21, 2019. Although Mr. Miller has paid $242 in restitution—$18.20 more than the amount ordered—the Florida Department of Corrections contends that he owes a balance of $1.11 because of the 4% surcharge charged on the restitution payments he has made. Mr. Miller still owes $1,221.25 in court costs and fines, and he is unable to pay these outstanding LFOs. Because of Mr. Miller's inability to pay off these monetary obligations, he fears that he might be removed from the voter registration rolls or denied the right to vote.

20.     Plaintiff FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP ("Florida NAACP") is a nonprofit, nonpartisan civil rights membership organization in Florida. Florida NAACP is a state conference of branches of the national NAACP ("NAACP"). The NAACP was formed in 1909, to remove all barriers of racial discrimination through democratic processes and through the enactment and enforcement of federal, state, and local laws securing civil rights, including laws relating to voting rights. The Florida NAACP's members are predominantly African American and other minority residents, who reside throughout Florida. The Florida NAACP also has local branch units throughout Florida, including the Orange County Branch NAACP ("Orange County NAACP"), discussed in more detail below, which themselves are membership organizations. Members of a branch are also members of the Florida NAACP. For example, Plaintiff Wright is a member of the Florida NAACP and the Indian River County Branch of the NAACP.

21.     The Florida NAACP and its local units have been heavily involved in voter registration and voter education activities for decades and have been credited with registering thousands of voters in the state. The organization conducts statewide voter protection on election days (including the operation, in 2018, of six "satellite centers"). Many members of the state and local branches, including the Orange County NAACP, had their rights restored on January 8, 2019, by operation

of Amendment 4. Some members of the state and local NAACPs, including the Orange County NAACP, as well as members of the communities that they serve, include low-income people with felony convictions, who will be permanently disenfranchised by operation of SB7066. Many of these impacted people are unable to determine the full amount of the LFOs that they may owe, cannot afford to fully pay all of their LFOs, and are at risk of being purged from the registration rolls when SB7066 becomes effective. SB7066—which amends Florida's voter registration form to require that individuals identify as having been convicted of a felony, and the means by which their voting rights were restored—will stigmatize members of the state and local NAACPs, including the Orange County NAACP, and individuals that they serve.

22.   Moreover, as a result of SB7066, Florida NAACP and its local units, including the Orange County NAACP, will have to expend much-needed resources identifying people with felony convictions to determine whether they are eligible to register, and the extent of any LFOs that they may owe. Were it not for SB7066, the Florida NAACP, and local units including the Orange County NAACP, would otherwise be spending these resources on its regular activities, such as registering voters, getting out the vote, and conducting statewide voter protection on election days.

23.     Plaintiff ORANGE COUNTY BRANCH OF THE NAACP ("Orange County Branch NAACP" or "Branch"), which was established in 1942, is a nonprofit, nonpartisan civil rights membership organization in Florida and local branch of the Florida NAACP, with the same mission, objectives, and voting-related activities, as the Florida NAACP. The Orange County NAACP has been heavily involved in voter registration and voter education activities for years, including being credited with registering thousands of voters in Orange County. Members of the Florida NAACP residing in Orange County, who also are members of the Orange County NAACP, will be affected by SB7066 as described above.

24.     Plaintiff LEAGUE OF WOMEN VOTERS OF FLORIDA (the "LWVF" or "League") is the Florida affiliate of the national League of Women Voters (the "National League"). LWVF is a nonpartisan, not-for-profit corporation organized under the laws of Florida, and a tax-exempt charity pursuant to section 501(c)(4) of the Internal Revenue Code.

25.     The mission of LWVF is to promote political responsibility by encouraging informed and active citizen participation in government, including by registering citizens to vote and influencing public policy through education and advocacy. LWVF has thousands of members in Florida and an even greater number of supporters and volunteers, who receive regular communications from

the League. The National League has conducted voter registration nationwide since 1920, and LWVF has conducted voter registration in Florida since before 1939. In the past, LWVF has conducted voter registration drives through the auspices of its 29 local Leagues located in cities and counties throughout Florida.

26.    Registering new voters is the core mission of LWVF, and an important part of accomplishing the League's goal of increasing political participation by underrepresented and disenfranchised communities, particularly residents of low-income, African American, and Hispanic/Latinx communities. LWVF assists voters in filling out voter registration applications, and then collects and submits them to the Supervisors of Elections. LWVF finds that this collection and submission are necessary to the success of its voter registration drives. Absent this assistance, LWVF has found that applicants are confused about how to properly fill out their applications and are unsure where and how to submit them, which results in incomplete, and therefore ineffective, registrations that later cause confusion at the polls when would-be voters find out they are not on the rolls. LWVF's success in registering new voters depends on its ability to not only persuade others of the importance of registering to vote, but also on its ability to assist others to fill in forms properly, to collect the forms, and to deliver completed forms to the appropriate State offices.

27.    LWVF volunteers: (i) generally discuss the importance of voting and of civic engagement; (ii) inform other citizens about important issues that will be decided in upcoming elections, such as ballot initiatives and referenda; and (iii) urge other citizens to associate with LWVF and with one another by registering to vote and engaging in meaningful collective action, described above, to advance shared political or social objectives.

28.    SB7066 significantly impedes LWVF's ability to engage in voter registration activities and thus directly burdens LWVF's fundamental speech and associational rights, which are inseparable and intertwined aspects of those activities. LWVF is careful to avoid inadvertently helping someone register to vote who is ineligible. Some volunteers will not engage in registration activities at all because of their concerns about SB7066. Because SB7066 renders LWVF volunteers unable to determine the eligibility of some returning citizens, it prevents LWVF from registering returning citizens who are in fact eligible to vote and whom LWVF would otherwise help register.

29.    As a result, LWVF has been forced to divert substantial time and resources away from registration activities to, *inter alia*: explain the complicated provisions of SB7066 to potential registrants; field inquiries from members and volunteers who cannot determine who is eligible to register under Amendment 4;

and develop new training materials for its volunteers and new educational materials for returning citizens.

30.     Defendant Secretary of State LAUREL M. LEE is sued in her official capacity as Secretary of State of the State of Florida. The Department of State ("DOS") "shall have general supervision and administration of the election laws." Fla. Stat. § 15.13. As Florida's "chief election officer," the Secretary must "[o]btain and maintain uniformity in the interpretation and implementation of the election laws." *Id.* § 97.012(1). She is responsible for "enforc[ing] the performance of any duties of a county supervisor of elections." *Id.* § 97.012(14). She is also responsible for providing "written direction and opinions to the supervisors of elections on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State." *Id.* §§ 97.012(4)–(5), (16). She is responsible for ensuring state compliance with all election laws. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) ("Because the Secretary is the state's chief election officer with the authority to relieve the burden on Plaintiffs' right to vote, she was appropriately sued for prospective injunctive relief.") (citing Fla. Stat. § 97.012); *see also Ex parte Young*, 209 U.S. 123 (1908) (permitting injunctive relief against individual state officers in their official capacities).

31.     Defendant KIM A. BARTON is the Supervisor of Elections for Alachua County, Defendant PETER ANTONACCI is the Supervisor of Elections for Broward County, Defendant MIKE HOGAN is the Supervisor of Elections for Duval County, Defendant CRAIG LATIMER is the Supervisor of Elections for Hillsborough County, Defendant LESLIE ROSSWAY SWAN is the Supervisor of Elections for Indian River County, Defendant MARK EARLEY is the Supervisor of Elections for Leon County, Defendant MICHAEL BENNETT is the Supervisor of Elections for Manatee County, Defendant CHRISTINA WHITE is the Supervisor for Elections for Miami-Dade County, and Defendant BILL COWLES is the Supervisor of Elections for Orange County, Defendant RON TURNER is the Supervisor of Elections for Sarasota County. These Defendants are responsible for conducting elections and voter registration in their respective counties. SB7066 gives local Supervisors of Elections ("SOEs") more front-end responsibility for registration, requiring them to "verify and make a final determination . . . regarding whether the person who registers to vote is eligible pursuant to [Amendment 4] and this section." Fla. Stat. § 98.0751(3)(b). While the SOE "may request additional assistance from the [Department of State] in making the final determination," *id.* § 98.0751(3)(c), the bill does not give SOEs any additional resources for this new responsibility.

## JURISDICTION

32.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

33.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States, and because Plaintiffs bring this action to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution of the United States and federal law.

34.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

35.    Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in Florida, and Defendant Barton has her principal place of business in this District.

36.    Under Northern District of Florida Local Rule 3.1(A)–(B), this case is properly filed in the Gainesville Division of this District because Defendant Barton has her principal place of business in a county included in the Gainesville Division.

## STATEMENT OF FACTS

### I.   Background on the Passage of Amendment 4

37.   On November 6, 2018, Florida voters resoundingly and decisively approved Amendment 4 to the Florida Constitution with 64.55 percent in support. 5,148,926 Floridians of every race and political party voted in favor of Amendment 4, reflecting the clear will of the people that individuals with felony convictions should re-join the electorate once they complete their sentence. Fla. Div. of Elections, *Voting Restoration Amendment 14-01*, https://dos.elections.myflorida.com/initiatives/initdetail.asp?account=64388 &seqnum=1 (last visited May 24, 2019).

38.   The full text of the Amended Article VI, Section 4 (Disqualifications), reads:

> (a) No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability. Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and *voting rights shall be restored upon completion of all terms of sentence including parole or probation*.

> (b) No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.

Fla. Const., Art. VI, § 4 (italics added).

39.     Amendment 4's language is clear and simple—the constitutional amendment ensures that individuals with a felony conviction, for a felony crime other than murder or a sexual offense, will have their voting rights "restored upon completion of all terms of sentence including parole or probation." *Id.* The Florida Supreme Court, in approving the title and summary of the amendment in 2017, declared that Amendment 4 conveyed to voters "that the chief purpose of the amendment is to *automatically* restore voting rights to felony offenders, except those convicted of murder or felony sexual offences, upon completion of all terms of their sentence." *Advisory Opinion to the Attorney Gen. Re: Voting Restoration Amendment*, 215 So. 3d 1202, 1208 (Fla. 2017) (emphasis added).[3]

40.     "[T]he power of the people to amend their state constitution by initiative is an integral part of Florida's lawmaking power." *Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1281 (11th Cir. 2012). The Elections Clause of the U.S.

---

[3] There is a presumption that provisions of the Florida Constitution are self-executing, *see, e.g.*, *Browning v. Fla. Hometown Democracy, Inc.*, 29 So. 3d 1053, 1064 (Fla. 2010), because "in the absence of such presumption the legislature would have the power to nullify the will of the people expressed in their constitution, the most sacrosanct of all expressions of the people," *Fla. Hosp. Waterman v. Buster*, 984 So. 2d 478, 485–86 (Fla. 2008) (quoting *Gray v. Bryant*, 125 So. 2d 846, 851 (Fla. 1960)). The Supreme Court's determination that Amendment 4 confers *automatic* rights restoration clarifies that the constitutional amendment does not require legislation and is self-executing. *See Gray*, 125 So. 2d at 851 (determining that a constitutional provision is self-executing if the right conferred "may be determined, enjoyed, or protected without the aid of legislative enactment.").

Constitution permits citizens, through the initiative process, to regulate elections as a lawmaking apparatus of a state. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2677 (2015). Floridians' initiative power permits them to constrain the state legislature's *own* authority, by amending the state constitution. *Brown*, 668 F.3d at 1278. They did so in Amendment 4.

41.     Self-executing constitutional provisions constrain the Legislature's authority. While the Legislature may "supplement, protect, or further the availability of the constitutionally conferred right . . . the Legislature may not modify the right in such a fashion that it alters or frustrates the intent of the framers and the people." *Browning v. Fla. Hometown Democracy, Inc.*, 29 So. 3d 1053, 1064 (Fla. 2010). As such, the Legislature cannot pass any legislation that would reduce (a) the rights guaranteed under Amendment 4, or (b) the number of people to whom they are guaranteed. *See id.*

42.     Amendment 4 was passed on November 6, 2018, and became effective on January 8, 2019.

43.     Returning citizens, like individual Plaintiffs and members of organizational Plaintiffs Florida NAACP and Orange County NAACP, began registering to vote on January 8, 2019, and subsequently voted in local elections

across Florida.[4] Just months after it was enacted, Amendment 4 had already made Florida's electorate more representative of its voting-age population by reinstating the voting rights of many people of color and less affluent individuals. More than 2,000 formerly incarcerated Floridians registered to vote between January and March 2019, about 44 percent of whom were Black people. Kevin Morris, *Analysis: Thwarting Amendment 4*, Brennan Ctr. for Just. 2–3 (May 9, 2019) https://www.brennancenter.org/sites/default/files/analysis/2019_05

_FloridaAmendment_FINAL-3.pdf. Similarly, the average income of formerly incarcerated Floridians who registered to vote during that time period was $14,000 below the average Florida voter. *Id.*

---

[4] Mainstream and widespread media coverage of the Amendment 4 campaign estimated that it would restore rights to between 1.2 and 1.6 million people in Florida. *See, e.g.*, Steve Bousquet, Connie Humburg & McKenna Oxenden, *What's Riding on Amendment 4 and Voting Rights for Convicted Felons*, Tampa Bay Times (Nov. 2, 2018), https://www.tampabay.com/florida-politics/buzz/2018/11 /02/amendment-4-democrats-and-blacks-more-likely-to-have-lost-voting-rights-than-republicans-and-whites/ (citing an estimated 1.2 million people affected by Amendment 4); Samantha J. Gross & Elizabeth Koh, *What is Amendment 4 on Florida ballot? It Affects Restoration of Felons' Voting Rights*, Miami Herald (Oct. 5, 2018), https://www.miamiherald.com/news/politics-government/election /article219547680.html (estimated 1.6 million); Steven Lemongello, *Floridians Will Vote This Fall on Restoring Voting Rights to 1.5 Million Felons*, Fla. Sun Sentinel (Jan. 23, 2018), https://www.sun-sentinel.com/news/politics/os-florida-felon-voting-rights-on-ballot-20180123-story.html (estimated 1.5 million). These estimates included returning citizens with outstanding LFOs, reflecting the common understanding—including by the Floridians who voted for it—that Amendment 4 was not intended to condition voting rights on ability to pay LFOs.

44.     Florida has been an ignominious outlier among states because of the breadth of, and racial disparities present in, its disenfranchisement. Prior to Amendment 4's passage, Florida was one of just four states that permanently disenfranchised its citizens for committing a single felony offense. Br. for The Sentencing Project as Amicus Curiae ("Brief for Sentencing Project"), *Hand v. Scott*, No. 18-11388, 2018 WL 3328534, at *5 (11th Cir. June 28, 2018). Florida disenfranchised a higher percentage of its citizens than any other state in the United States and was responsible for more than 25 percent of all U.S. citizens disenfranchised nationwide. *Id.* at *14–*15. As of November 2016, more than 1.6 million Floridians—about 92 percent of whom had already completed their terms of sentence, *id.*, were disenfranchised on account of a felony conviction, comprising "[m]ore than *one-tenth* of Florida's voting population," *Hand*, 285 F. Supp. 3d at 1310 (emphasis in original).

45.     The racial disparities within the disenfranchised community are pervasive and deeply entrenched.[5] Prior to Amendment 4's passage, "[m]ore than

---

[5] There was widespread and mainstream media coverage of these racial disparities during the Amendment 4 campaign. *See, e.g.*, Gabby Deutch, *Florida Felons Want Their Voting Rights Restored*, The Atlantic (Sept. 13, 2018), https://www.theatlantic.com/politics/archive/2018/09/florida-felons-want-their-voting-rights-restored/570103/; *see also* Steve Bousquet et al., *1.2 Million Floridians Have a Lot Riding on Passage of Amendment 4*, Miami Herald (Nov. 2, 2018), https://www.miamiherald.com/news/politics-government/state-politics/article221021940.html.

one in five of Florida's African American voting-age population" could not vote. *Id.* One reason for this staggering percentage is that Black Floridians are more likely to be arrested, charged, convicted, and face harsher sentences than white Floridians. *See Racial Bias in Florida's Electoral System*, Brennan Ctr. for Just. & Fla. Rights Restoration Coal. (Jan. 2006), https://www.brennancenter.org/sites /default/files/legacy/d/download_file_9477.pdf; *see also* Nick Petersen et. al, *Unequal Treatment: Racial and Ethnic Disparities in Miami-Dade Criminal Justice* at 5, ACLU of Fla. – Greater Miami Chapter (July 2018), https://www.aclufl.org/sites/default/files/aclufl_unequaltreatmentreport2018.pdf. While Black people comprised 16 percent of Florida's population in 2016, they made up nearly 33 percent of all those disenfranchised by a felony conviction. Erika L. Wood, *Florida: An Outlier in Denying Voting Rights* ("Wood") 1, 3 Brennan Ctr. for Just. (2016), https://www.brennancenter.org/sites/default/files /publications/Florida_Voting_Rights_Outlier.pdf.

46.     Florida has a long, troubling history with voter suppression tactics, many explicitly motivated by racial discrimination—including the very felony disenfranchisement provision revised by Amendment 4. In its 1865 constitution, Florida "explicitly limited the right to vote to 'free white males.'" *Id.* at 4. A year later, Florida became one of ten former Confederate states to reject the Fourteenth Amendment to the U.S. Constitution, and thus, the constitutional mandate that no

state can deny any person the equal protection of the laws. *Id.* In 1868, after Congress mandated that Florida adopt a constitution without an explicitly racially discriminatory suffrage rule, Florida ratified a constitution that permanently banned individuals with felony convictions from voting, a provision that Florida paired with the Black Codes, which increased the number of felonies and "increased prosecution . . . for certain crimes the legislature believed were more likely to be committed by freed blacks." *Id.* at 4–5.[6] The intent of these measures, which came in the immediate aftermath of the abolition of slavery, "was quite clear: to eliminate as many black voters as possible." Tim Elfrink, *The Long, Racist History of Florida's Now-Repealed Ban on Felons Voting*, Wash. Post (Nov. 7. 2018), https://www.washingtonpost.com/nation/2018/11/07/long-racist-history-floridas-now-repealed-ban-felons-voting/?utm_term=.aa37bdf36300 (quoting Darryl Paulson, emeritus professor of government at the University of South Florida). In 1889, Florida became the first state to adopt a poll tax, followed shortly after by other Jim Crow voter suppression tactics such as literacy tests and residency requirements. *See id*. Florida's voter suppression tactics effectuated their purpose; in 1940, only 3 percent of Florida's Black population was registered to

---

[6] *See Timbs v. Indiana*, 139 S. Ct. 682, 689–90 (2019) ("Among these laws' provisions were draconian fines for violating broad proscriptions on 'vagrancy' and other dubious offenses. When newly freed [enslaved people] were unable to pay imposed fines, States often demanded involuntary labor instead.") (citations omitted).

vote. *Id*. The history of discrimination and vestiges of Jim Crow underlying Florida's felon disenfranchisement statute were known and expressly acknowledged by Florida lawmakers during the legislative debate over SB7066. *See, e.g.*, Video: April 24, 2019 House Sess. ("April 24 House Hearing") at 5:25:05, https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=2443575804 _2019041282 (testimony from Rep. Jacquet) ("In 1868, we decided in order to limit the voice of certain communities, to set aside a certain population, this was the strategy.").

47.     The ramifications of this history continue into the present. Wealth disparities persist for Black and Latinx families in Florida as compared to white families. Alan J. Aja et al., *The Color of Wealth*, The Kirwan Institute, Samuel DuBois Cook Center on Social Equity, and Insight Center for Community Economic Development 1, 7—10 (2019), http://kirwaninstitute.osu.edu/wp-content /uploads/2019/02/The-Color-of-Wealth-in-Miami-Metro.pdf; *How Families of Color are Faring in Florida*, Corp. for Enterprise Dev. (Jan. 2016), https://catalystmiami.org/wp-content/uploads/2016/02/racial-disparity-FL.pdf. The Black unemployment rate is twice as high in Florida when compared to the white unemployment rate. Aja at 39–40.

48.     There are a multitude of collateral consequences triggered by a felony conviction, including ineligibility for federally subsidized housing, driver's

32

license suspension, and employment barriers. These collateral consequences make the financial circumstances of returning citizens far less tenable, hampering reentry and leaving them with limited resources to pay outstanding LFOs.

## II.    Florida's Voter Registration Process

49.    Once Amendment 4 became effective, Floridians who had their rights restored by operation of the amendment could register to vote using the same process as all other voters.

50.    Before SB7066, to register to vote, an individual must first obtain a voter registration form in hard copy or online. *See* Fla. Stat. §§ 97.052; 97.0525. This form is statewide and is currently Form DS-DE #39, R1s-2.040, F.A.C., *available at* https://dos.myflorida.com/media/693757/dsde39.pdf (last visited May 24, 2019).

51.    The form gave the applicant the option to check a box with the following statement: "I affirm that I am not a convicted felon, *or if I am, my right to vote has been restored*." *Id.* (emphasis added).

52.    Voter registration forms were "designed so that convicted felons whose civil rights have been restored . . . are not required to reveal their prior conviction or adjudication." Fla. Stat. § 97.052(2)(u).

53.    SB7066 amends Florida's voter registration form to give returning citizens three options—one stating that an individual has "never been convicted of

a felony," a second stating that an individual's "voting rights have been restored by the Board of Executive Clemency," and a third stating that an individual's "voting rights have been restored pursuant to [Amendment 4]." *Id.* § 97.052(2)(t). There is *no* box for individuals who lose their voting rights due to a felony conviction in another state and have their rights restored by that state before moving to Florida. *See* Dep't of State Advisory Opinion 04-05, 2–3 (May 27, 2004), *available at* http://opinions.dos.state.fl.us/searchable/pdf/2004/de0405.pdf ("Those persons convicted of felonies outside of Florida whose voting rights were restored by the state wherein the felony was committed, may register to vote in Florida. No evidence of the civil rights restoration is required at the time of registration.").

54.   Applicants with a prior felony conviction who have completed "all terms of sentence" need *not* provide affirmative evidence that their voting rights have been restored beyond these affirmations. As the Florida Department of State, Division of Elections explained in a formal Advisory Opinion:

> Felons who have had their rights restored, whether they were convicted in Florida or in another state, do not need to present evidence of restoration of rights at the time of application for voter registration. Checking the appropriate box on the voter registration application representing that although they are convicted felons, their civil rights have been restored, and signing the oath included in the application affirming that the information provided is correct, is sufficient. Such representations are all that is required under the Florida election laws.

*Id.* at 2.

55.     Florida SOEs are required to accept voter registration applications from all applicants in their county offices. Fla. Stat. § 97.053(1). An application is complete, and should be approved, (a) when "all information necessary to establish the applicant's eligibility pursuant to § 97.041 is received by a voter registration official," and (b) when that information is "verified pursuant to" *Id.* § 97.053(6). *Id.* § 97.053(2).

56.     All voter registration applications received by a voter registration official must be entered into the statewide registration system within 13 days of receipt, at which point it "shall be immediately forwarded to the appropriate supervisor of elections." *Id.* § 97.053(7). Upon receipt of a voter registration application, the SOE "must notify [the] applicant of the disposition of the . . . application within 5 business days after voter registration information is entered into the statewide voter registration system." *Id.* § 97.073(1).

57.     The SOE's notification "must inform the applicant that the application has been approved, is incomplete, has been denied, or is a duplicate of a current registration." *Id.* The mailing of a voter information card "constitutes notice of approval of registration." *Id.* "If the application is incomplete, the supervisor must request that the applicant supply the missing information using a voter registration application signed by the applicant." *Id.*

58.     The voter registration process is a uniquely effective way for third-party voter registration organizations to communicate nonpartisan political messages and encourage fellow citizens to participate in the political process. Voter registration activities provide the opportunity for organizational Plaintiffs' members and volunteers, and other third-party voter registration organizations, to exercise their First Amendment rights.

## III.     Challenged Provisions of SB7066

59.     SB7066 creates two classes of citizens: those who can afford to have their voting rights restored and those who are too poor to vote, a disproportionate number of whom are racial minorities.

60.     In practice, SB7066 would maintain long-term—and in many cases permanent—disenfranchisement for a large majority of returning citizens. Many individuals with debt incurred as a result of a conviction are indigent and will not have the means to pay their LFOs immediately (or ever). *See* Alicia Bannon et al., *Criminal Justice Debt: A Barrier to Reentry*, Brennan Ctr. for Just. 1, 4 (2010), http://www.brennancenter.org/sites/default/files/legacy/Fees%20and%20Fines %20FINAL.pdf (An estimated "80–90 percent of those charged with criminal offenses qualify for indigent defense."). And even for those returning citizens who are not indigent, many have incurred massive fines, fees, or restitution obligations

that they cannot pay in full immediately, which means that they would be disenfranchised in election after election due to their inability to pay.

61.     Even though many returning citizens in Florida have been convicted in federal or out-of-state courts, the LFOs imposed under Florida law provide important context for understanding the burdens imposed by SB7066. Persons convicted in Florida state courts can be assessed fines, fees, costs, and restitution. Courts assess fines in addition to, or, where authorized by statute, in lieu of, other penalties, including incarceration. *See* Fla. Stat. § 775.083(1). "If a defendant is unable to pay a fine, the court may defer payment of the fine to a date certain." *Id*. Fines are deposited by the clerk of the court in the county's fine and forfeiture fund. *Id*.

62.     In Florida, court costs are often mandatory, and offset the costs of maintaining the criminal justice system.[7] *See* Fla. Stat. Ch. 938. The sentencing

---

[7] The Supreme Court has recently observed that state and local governments have an incentive to generate revenue by imposing abusive LFOs on individuals in the criminal justice system. *See Timbs*, 139 S. Ct. at 689 ("[F]ines may be employed 'in a measure out of accord with the penal goals of retribution and deterrence,' for 'fines are a source of revenue,' while other forms of punishment 'cost a State money.'" (quoting *Harmelin v. Michigan*, 501 U.S. 957, 979, n.9 (1991)); *id*. ("Perhaps because they are politically easier to impose than generally applicable taxes, state and local governments nationwide increasingly depend heavily on fines and fees as a source of general revenue.") (quoting Brief of the Am. Civil Liberties Union et al. as Am. Curiae, *Timbs v. Indiana*, No. 17-1091, 2018 WL 4462202, at *7 (Sep. 10, 2018)). In Florida, between 1996 and 2010, the legislature added more than 20 new categories of LFOs for criminal defendants while simultaneously eliminating most exemptions for those unable to pay. Rebekah

court has jurisdiction to ensure compliance with court cost obligations. *Id.* § 938.30(1). Certain costs are statutorily required, irrespective of a defendant's indigence and inability to pay. *See, e.g.*, *id.* § 938.27(2)(a) ("The court shall impose the costs of prosecution and investigation notwithstanding the defendant's present ability to pay."); § 938.29(1)(b) ("Upon entering a judgment of conviction, the defendant shall be liable to pay the attorney's fees and costs in full . . . The court shall impose the attorney's fees and costs notwithstanding the defendant's present ability to pay."). A court may defer certain costs after determining a person's inability to pay or order compliance with a payment schedule. *See id.* § 938.30(9)-(10). A court may also enforce LFOs in the manner allowed in civil cases, including as a lien against property, which secures the judgment amount as well as interest and costs. *See id.* § 938.30(6).

63.     Florida courts order restitution pursuant to Fla. Stat. §§ 960.29(3)(a)–(b), typically based on the amount of loss sustained by the victim as a result of a defendant's actions. *Id.* § 775.089(6)(a). When determining whether to order restitution and its amount, a trial court "shall consider the amount of the loss sustained by any victim as a result of the offense." *Id.* "[T]he defendant's financial resources or ability to pay does not have to be established when the trial court

---

Diller, *The Hidden Cost of Florida's Criminal Justice Fees* 1, 1 Brennan Ctr. for Just.    (2010),    https://www.brennancenter.org/sites/default/files/legacy/Justice /FloridaF&F.pdf?nocdn=1 ("Diller Report").

assesses and imposes restitution." *Noel v. State*, 191 So.3d 370, 375 (Fla. 2016) (quotation marks omitted).

64.     A criminal court may require that a defendant make restitution within a specified period or in specified installments. *Id.* § 775.089(3)(b).

65.     A court may convert an outstanding restitution from a criminal to a civil obligation if full payment is not made within a given period. *See id.* § 775.089(3)(d).[8]

66.     SB7066 states that, to complete "all terms of sentence," there must be "[f]ull payment of restitution ordered to a victim by the court as part of the sentence." *Id.* § 98.075(2)(a)(5)(a). SB7066 also requires "[f]ull payment of fines or fees ordered by the court as a part of the sentence or that are ordered by the court as a condition of any form of supervision. *Id.* § 98.0751(2)(a)(5)(b). The bill specifies that these financial obligations "include only the amount specifically ordered by the court as part of the sentence and do not include any fines, fees, or costs that accrue after the date the obligation is ordered as a part of the sentence." *Id.* § 98.0751(2)(a)(5)(c). SB7066 then specifies that "[t]he requirement to pay any

---

[8] Restitution is also reduced to a civil judgment if the court does not order supervision. *See* Fla. Stat. § 775.089(3)(d). If restitution claims are transferred to a civil lien, victims or the state may enforce that civil restitution lien in the same manner as a judgment in a civil action. *Id.* § 960.294(2).

financial obligation specified . . . is not deemed completed upon conversion to a civil lien." *Id.* at § 98.0751(2)(a)(5)(e)(III).

67.     In other words, SB7066 requires that returning citizens pay *all* financial obligations specified within a sentencing document before registering to vote, even if the obligation has been converted to a civil judgment, and without requiring *any* determination that they can pay those financial obligations. Indeed, SB7066 requires full payment of LFOs even in cases where returning citizens have *no* ability to pay outstanding financial obligations. This requirement is perversely punitive if a court has converted LFOs from criminal to civil obligations. SB7066 also erroneously attempts to redefine LFOs that have been converted to civil liens as a term of a criminal sentence for purposes of extending individuals' disenfranchisement.[9]

68.     Many returning citizens have outstanding financial obligations that they cannot pay. The Florida Circuit Criminal Courts in 2018 reported that "the collections rate for fines and fees was just 20.55%." Fines & Fees Justice Center,

---

[9] At a joint House committee hearing, Frederick Lauten, Chief Judge of Florida's Ninth Judicial Circuit, testified that "enforcement []post-sentence" is a "judicial obligation," and that "when the lawful authority to detain or supervise a person comes to an end, the sentence is completed in the view of [FDOC], regardless of how that authority came to an end." Video: Feb. 14, 2019, Jnt. House Meeting of the Criminal J. Subcomm. & the Judiciary Comm. at 1:03:00–1:04:32 https://thefloridachannel.org/videos/2-14-19-joint-house-meeting-of-the-criminal-justice-subcommittee-and-the-judiciary-committee/ (last visited May 26, 2019).

*Annual Assessments and Collections Report [Florida, 2013–2018]* (Sept. 30, 2018), https://finesandfeesjusticecenter.org/articles/annual-assessments-and-collections-report-florida-2013-2018/. This suggests that the vast majority of Floridians cannot fully pay their outstanding LFOs and that SB7066 would have a massive disenfranchising effect. Indeed, more than 83 percent of all court-related fines and fees are labeled as "minimal collections expectations." *Id.* This means the Clerk of the Courts Association does not anticipate receiving a payment on the debt because of the person's financial status. *Id.*[10]

69.     In a superficial response to sustained public criticism of SB7066's disenfranchising impact, the bill sponsors purported to add a failsafe that would allow returning citizens to fulfill their LFOs without full payment *if* a court modifies their sentence. *See* Fla. Stat. § 98.0751(5)(e)(III). But the putative failsafe is fatally inadequate and ineffectual for multiple reasons.

---

[10] Mainstream media has reported on this reality. One news report, for example, found that between 2013 and 2018 alone, Florida had issued more than $1 billion in felony fines, only 19 percent of which has been paid back per year. Daniel Rivero, *Felons Might Have to Pay Hundreds of Millions Before Being Able to Vote in Florida*, WLRN Public Radio and Television (Jan. 20, 2019), https://www.wlrn.org/post/felons-might-have-pay-hundreds-millions-being-able-vote-florida. In Miami-Dade County, there are more than $278 million in outstanding court fines from felony convictions; in Palm Beach County, more than $195.8 million in outstanding court fines from felony convictions (including interest) remain outstanding. *Id.*

70.    First, for residents with *out-of-state*[11] or *federal* convictions, like Plaintiffs Leicht and Phalen, Florida courts have no jurisdiction to modify or terminate their sentences. In addition, Florida criminal courts may not have authority to waive financial obligations once those obligations are converted to civil liens. *See* Video: May 3, 2019 House Sess. Part 2 ("May 3 House Hearing") at 1:24:47, https://thefloridachannel.org/videos/5-3-19-house-session-part-2/ (in which Representative Joe Geller states that "once [a financial obligation] can no longer be enforced by contempt . . . it is no longer part of a criminal sentence") (last visited May 7, 2019); *see also supra* note 9.

71.    Second, even for in-state convictions, SB7066 permits modification only in two scenarios that are plainly not viable in the vast majority of cases: (1) if a third-party *payee* approves "through appearance in open court" or "production of notarized consent" the termination of a returning citizen's LFOs and a court approves, or (2) if a court exercises its discretion to "convert[] the financial obligation to community service," and the individual completes that community service obligation. *Id.* § 98.0751(2)(a)(5)(e).

72.    Under the first scenario, third party payees—including insurance companies, for-profit debt collection agencies, and private individuals—appear to

---

[11] House bill sponsor Representative James Grant conceded as much when testifying before the state House, stating that the modification remedy "probably doesn't help" returning citizens with out-of-state convictions. May 3 House Hearing at 13:48. "There's nothing we can really do about that," he added. *Id.*

have absolute discretion to grant or deny a person's request for approval to terminate LFOs, for any reason, no reason, or based on personal whims. *Id.* § 98.0751(2)(e)(II). SB7066 provides no standard or guidance to courts or state agencies on whether to approve termination of LFOs when acting as a payee, thereby inviting arbitrary determinations. And, SB7066 provides no mechanism for approval if a payee is unavailable or non-responsive.

73.    Under the second scenario, conversion of LFOs to community service is discretionary: courts are under no obligation to provide an opportunity for a returning citizen to convert her LFOs into a community service obligation, even if that court finds that the individual has no ability to pay. *See id.* § 938.30(2); *see also* Video: May 3, 2019 House Sess. Part 2 ("May 3 House Hearing") at 37:33, https://thefloridachannel.org/videos/5-3-19-house-session-part-2/ (House sponsor Representative James Grant testifying that SB7066 did not require that any courts or circuits have a community service conversion program, stating only that circuits could follow whatever practices they currently undertake).

74.    Community service conversion is also rare in practice—the Florida Clerks of Court found in 2008 that "only 16 of 67 counties reported converting any mandatory LFOs imposed in felony cases to community service," and "[o]f those 16 that did report using community service, 10 converted less than $3000 of mandatory LFOs to community service in one year." Diller Report at 23. House

43

sponsor Representative James Grant conceded that the bill did not require that any courts or circuits have a community service conversion program, stating only that circuits could follow whatever practices they currently undertake. May 3 House Hearing at 37:33.[12] Further, Florida law requires that individuals performing court-ordered community service get paid at the federal minimum hourly wage, *see* Fla. Stat. §§ 938.30(2), 318(18)(a)–(b), currently $7.25 per hour—meaning that it will take any returning citizens with more than *de minimis* financial obligations exceedingly lengthy periods of time to regain their right to vote via community service. When Representative Anna Eskamani raised this latter point—that lower-income returning citizens would not have a pathway to rights restoration because the hourly rates for community service are so low—House sponsor Representative Grant said only: "that's not a concern." May 3 House Hearing at 1:02.

75.     Ultimately, in both design and effect, SB7066 disqualifies individual Plaintiffs and members of organizational Plaintiffs Florida NAACP and Orange County NAACP, who have completed the terms of their sentence including

---

[12] The bill sponsor, Senator Jeff Brandes, also acknowledged "there is no definitive standard" but it is simply an option for returning citizens to return to court to petition that their financial hardship be a basis for conversion. Video: May 2 Senate Hearing ("May 2 Senate Hearing") at 6:30:41, https://www.flsenate.gov /media/VideoPlayer?EventID=2443575804_2019051020&Redirect=true (testimony from Sen. Brandes).

probation or parole, from eligibility to vote because of outstanding financial obligations that they are unable to pay.

## IV.    Legislative History of SB7066

76.    After Amendment 4's passage, the House and Senate held hearings related to HB7089, SB7086, and SB7066, discussed in more detail below. Even though these hearings were truncated because sponsors openly refused to consider key information, the record revealed three overriding flaws with the Legislature's alteration of the rights guaranteed by Amendment 4. First, the hearings showed that it will be practically impossible for Florida officials to determine who is, and is not, automatically restored and eligible to register under SB7066. For example, Lee Adams, Chief of FDOC's Bureau of Admission and Release, testified that FDOC in many cases "has no way of knowing" if an individual has not completed her financial obligations after termination of supervision. Video: Feb. 14, 2019, Jnt. House Meeting of the Criminal J. Subcomm. & the Judiciary Comm. at 1:18, https://thefloridachannel.org/videos/2-14-19-joint-house-meeting-of-the-criminal-justice-subcommittee-and-the-judiciary-committee/ (last visited May 7, 2019). Carolyn Timmann, Martin County Clerk of Court, stated that county clerks have "some [] limitations" in their data on returning citizens, the biggest one being restitution, and "in the majority [of cases], we do not [have restitution information]." *Id.* at 29:56, 54:18. Timmann testified that courts often order

individuals to pay restitution directly to victims, for which there are no receipts or documentation. *Id* at 54:18.

77.     Representative Grant, who sponsored HB7089, conceded that there is no existing database or repository that conclusively provides SOEs with information about whether a returning citizen paid all LFOs. Video: Apr. 23, 2019, House Floor Hearing ("April 23 Hearing") at 7:04:00–7:04:07, https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=2443575804 _2019041264 ("There is no stakeholder in the State of Florida that can serve as a source of truth that somebody completed all terms of their sentence."); *see also* Video Feb. 14, 2019, House Comm. Joint Hearing at 1:03:30–1:04:05, https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=2443575804 _2019021160; May 3 House Hearing at 42:49 (stating that there were "data . . . spread out all over government," and that there was no "efficient or effective" way for Florida officials to compile that data in one place).

78.     Additionally, SB7066 fails to provide any criteria or guidelines for how an SOE is supposed to "verify and make a final determination . . . regarding whether the person who registers to vote is eligible pursuant" to Amendment 4, Fla. Stat. § 98.0751(3)(b) (2019), or to evaluate evidence presented at a hearing to determine the eligibility of a returning citizen when the evidence is questioned or challenged.

79.    Second, legislators heard from returning citizens who were permitted to testify at some committee hearings, all of whom testified that provisions enacted in SB7066 would permanently disenfranchise them based on their inability to pay outstanding LFOs. Legislators heard from Plaintiff Karen Leicht, who testified that she had $58 million in outstanding restitution obligations despite dutifully making monthly payments. Video: Mar. 25, 2019, Hearing of Senate Comm. on Criminal J. ("March 25 Hearing") at 1:31, https://thefloridachannel.org/videos/3-25-19-senate-committee-on-criminal-justice (last visited May 7, 2019). Ms. Leicht testified that at the time her probation officially ended, "it was my complete and total understanding that at that point, when I signed that paper, I was free," *id.* at 1:32, but that at first she was too "timorous" to register to vote because she did not "want to be considered to have committed any crime," *id.* at 1:36. After her testimony, Senator Jason Pizzo, who represents Ms. Leicht's state senate district, told her to "go register to vote" and that she would not be prosecuted. *Id.* at 1:38.[13]

Legislators also heard from Erica Racz, a returning citizen who spent 13 years in

---

[13]    Nothing about Senator Pizzo's recommendation prevents Florida from attempting to purge Ms. Leicht or any of the other individual Plaintiffs from the voter rolls based on outstanding LFOs. Nothing about Senator Pizzo's recommendation prevents the State from prosecuting returning citizens with outstanding LFOs who believe that their rights were restored under Amendment 4 and register to vote after July 1, 2019. Senator Brandes stated as much: it would "depend on individual facts" and be "up to the discretion of the prosecutor." May 2 Senate Hearing at 7:16:28–7:16:51 (colloquy between Senator Rodriquez and Senator Brandes).

prison and four years on probation, who testified that she "cannot afford" her $57,000 in outstanding financial obligations as a single mother: "You want me to pay the government $57,000 to vote?" Video: Apr. 4, 2019, Hearing of House Comm. on State Affairs ("April 4 Hearing") at 3:42, https://thefloridachannel.org/videos/4-4-19-house-state-affairs-committee/ (last visited May 7, 2019). And legislators heard from Coral Nichols, a returning citizen who now runs a nonprofit called Empowered to Change, who testified that she has $190,000 in outstanding restitution. "At $100 a month, I will be 190 years old before I am eligible to vote," she testified. Video: Apr. 9, 2019, Hearing of House Comm. on Judiciary at 3:24, https://thefloridachannel.org/videos/4-9-19-house-committee-on-judiciary/     (last visited May 7, 2019).

80.     Public debate among legislators showed that they were plainly aware that SB7066 would disenfranchise voters. At one hearing, for example, Representative Adam Hattersley stated, "we'd create two classes of returning citizens. . . . There would be a minority of well-off individuals who would be able to repay their fines quickly and regain the right to vote; then, there'd be indigent citizens." April 4 Hearing at 3:49. Representative Michael Grieco warned that the proposed legislation would not be faithful to "the will of the voters," which was "very clear" that "1.4 million Floridians or more" would have their voting rights restored. Video: Mar. 19, 2019, Hearing of House Subcomm. on Criminal J. at

1:41,          https://thefloridachannel.org/videos/3-19-19-house-criminal-justice-subcommittee/ (last visited May 7, 2019).

81.    Third, the sponsors of the House and Senate legislation willfully refused to empirically study or determine how many people would be disenfranchised on account of their legislation. In the House, sponsor Representative Grant said that he did not know or care how many people would be disenfranchised if the legislation passed: "I was asked, have I done a study to know how many people are impacted by this. I said no. They said, are you willing to take a study. I said no. And here's why. I'm happy to review when we're done, members. But members, I don't want to know the impact of this. Because it's irrelevant." April 4 Hearing at 3:57. A month later, he told the full House that he "intentionally stayed blind to the data of the affected classes." May 3 House Hearing at 1:06.

82.    In the Senate, when asked how many Floridians have outstanding financial obligations, bill co-sponsor Senator Keith Perry said that he did not know. March 25 Hearing at 35:07. These statements suggest that legislators deliberately chose not to consider specific data documenting the fact that the law will disenfranchise hundreds of thousands of returning citizens because they are experiencing poverty, with a stark disproportionate impact based on race. But the U.S. Supreme Court has recognized that lawmakers may be presumed to be

familiar with the demographics and socioeconomics of their state. *Cf. Shaw v. Reno*, 509 U.S. 630, 646 (1993) ("[T]he legislature always is *aware* of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors."). This presumption should be particularly salient in this context, given that HB7089 and SB7086 arose in the House and Senate's respective Criminal Justice Subcommittees, where members are aware of the racial and socioeconomic demographics of the Florida and federal criminal systems, including the rates of felony disenfranchisement by race, discussed *supra*. These members are aware that people with felony convictions commonly have LFOs following completion of incarceration and supervision, that the vast majority of LFOs go uncollected by the state because many people cannot pay them, and that persistent wealth disparities exist between Black and non-Black individuals and families in Florida.

83.     Similarly, willful avoidance of inconvenient information does not preclude knowledge of such facts, particularly when they are a matter of "common sense." *See United States v. Schaffer*, 600 F.2d 1120, 1122 (5th Cir. 1979) ("[D]eliberate ignorance is the equivalent of knowledge."). The Legislature presumptively knew that SB7066 would disproportionately harm Black citizens.

84.     Based on the likely racial and socioeconomic impact of the proposed laws and the difficulties that many returning citizens have in paying LFOs,

advocates urged both chambers to study the racial and other impact of the bills. *See*, *e.g.*, Letter from Leah Aden et al., Deputy Dir. of Litig., LDF, to the Fla. Senate (Apr. 30, 2019), https://www.naacpldf.org/wp-content/uploads/NAACP-LDF-and-FLorida-NAACP-Opposition-to-SB-7086.pdf; Letter from Leah Aden et al., Deputy Dir. of Litig., LDF, to the Fla. House of Representatives (Apr. 22, 2019), https://www.naacpldf.org/wp-content/uploads/House-of-Representatives _2019-04-22_NAACP-LDF-and-FL-NAACP-Opposition-to-HB-7089_final.pdf.

85.     Members of the Black caucus inquired about the racial impact of the bills. *See*, *e.g.*, April 23 Hearing at 7:05:31-7:05:40, (colloquy between Rep. Driskell and Rep. Grant). As discussed above, Representative Grant went on to state that: "I have intentionally not looked at the numbers." *Id*. at 7:06:00–7:06:40.

## V.     Specific Sequence of Events Leading to SB7066's Passage

86.     During consideration of HB7089 and SB7086, House and Senate members proposed amendments to each bill that would have mitigated the restrictive and discriminatory impacts of the proposed legislation. Both chambers, however, rejected significantly ameliorative amendments, such as one introduced by Representative McGhee, who is Black, that would have removed the requirement to pay *all* LFOs. *Id.* at 8:21:45.

87.     On April 29, 2019, Senator Brandes introduced a strike-all amendment to the House bill, HB7089, that included the harshest LFO

requirements and imposed burdens on SOEs to verify eligibility.[14] The strike-all amendment also included new language that was not in previous versions of the House and Senate bills, including changes to the uniform voter registration form, as discussed above.

88.     Without further debate on SB7086, on May 2, 2019, Senator Brandes introduced a new strike-all amendment to an entirely separate Senate elections bill—SB7066.

89.     This strike-all amendment was a hybrid of the most restrictive aspects of HB7089 and SB7086 and mandated new burdens, discussed *supra*. These aspects include: requiring the payment of all LFOs, including those converted to civil obligations; placing unfunded mandates and burdens on SOEs; and forcing returning citizens to reveal their felony conviction on the voter registration form.

90.     There was no need for such a restrictive LFO requirement. The disconnect between the provisions of SB7066 and the issues it purports to address

---

[14] Tellingly, in a colloquy between Senator Pizzo and Senator Brandes on May 2, Senator Brandes conceded that alternative, less restrictive iterations of the Senate Bill from weeks past effectuated the "will of the electorate," particularly with respect to those versions' treatment of the terms of sentence provision. May 2 Senate Hearing at 6:35:50–6:38:38 (colloquy between Senator Pizzo and Senator Brandes).

support the inference that the proffered justifications are pretext for an impermissible motive.

## CLAIMS FOR RELIEF

### COUNT ONE

**Fourteenth Amendment to the U.S. Constitution,
as enforced by 42 U.S.C. § 1983
Violation of Fundamental Fairness**

91.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

92.    Section 1 of the Fourteenth Amendment to the U.S. Constitution bars states from depriving "any person of . . . liberty . . . without due process of law" and from depriving "any person within its jurisdiction the equal protection of the laws."

93.    The Due Process and Equal Protection Clauses of the Fourteenth Amendment prohibit states from imposing punishment for non-payment of LFOs without a prior determination that the individual was able to pay and willfully refused to do so. The Fourteenth Amendment's doctrine of fundamental fairness prevents states from punishing individuals if they fail to do the impossible—satisfy legal financial obligations when they do not have the means to do so. *See, e.g.*, *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996); *Bearden v. Georgia*, 461 U.S. 660 (1983); *Tate v. Short*, 401 U.S. 395 (1971); *Mayer v. City of Chicago*, 404 U.S. 189

53

(1971); *Williams v. Illinois*, 399 U.S. 235 (1970); *Griffin v. Illinois*, 351 U.S. 12 (1956).

94.     Plaintiffs have completed all of the terms of their sentences including parole or probation.

95.     Plaintiffs have outstanding civil obligations for court costs, fees, fines, and restitution resulting from a conviction.

96.     Mr. Gruver owes $801 in court costs and fees as a result of felony convictions. Mr. Mitchell owes approximately $2,143 in court costs and fees as a result of a felony conviction fourteen years ago when he was seventeen years old. Ms. Riddle owes approximately $1,800 in court costs and fees as a result of felony convictions. Mr. Wrench owes $3,000 in court costs and fees as a result of felony convictions. Ms. Wright owes at least $50,000 in court costs and a fine as a result of a felony conviction. Ms. Leicht owes approximately $58 million in outstanding restitution jointly and severally with her former co-defendants as a result of a conviction. Mr. Phalen owes about $110,000 in outstanding restitution and court costs and fees. Mr. Miller owes $1,221.25 in outstanding court costs and fines. Pastor Tyson owes court costs and fees, though Florida records are unclear about how much he has outstanding.  Plaintiffs are unable to pay these obligations.

97.     SB7066 violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment by disqualifying Plaintiffs from voting solely for failure to

pay outstanding LFOs despite the fact that (1) they are unable to pay, and (2) there has been no prior determination that they willfully refused to pay.

98.    SB7066 violates the Fourteenth Amendment by conditioning Plaintiffs' right to vote on payment of LFOs that Plaintiffs cannot pay.

## COUNT TWO

**Fourteenth Amendment to the U.S. Constitution,
as enforced by 42 U.S.C. § 1983
Unconstitutional Discrimination in Violation of Equal Protection**

99.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

100.    SB7066 invidiously discriminates between Florida citizens with a prior felony who can pay their LFOs, and Florida citizens with a prior felony who cannot pay.

101.    It is well established that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

102.    A state "violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an

electoral standard." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966); *see also Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1216 n.1 (11th Cir. 2005) ("Access to the franchise cannot be made to depend on an individual's financial resources.") (quoting *Harper*, 383 U.S. at 668)).

103.    The Equal Protection Clause applies to felony disenfranchisement and rights-restoration laws. *See Johnson*, 405 F.3d at 1230 ("Plaintiffs have a remedy if the state's [felony disenfranchisement] provision violates the Equal Protection Clause.").

104.    SB7066 unconstitutionally conditions exercise of Plaintiffs' voting rights on their ability to pay outstanding LFOs, even after Plaintiffs have completed the terms of their sentences and probation.

105.    Plaintiffs are not able to pay their outstanding LFOs.

106.    There is no rational, let alone compelling, basis for disenfranchising Plaintiffs when they cannot pay LFOs or when they are paying LFOs but cannot afford to complete payment immediately.

107.    Plaintiffs' ability to pay these financial obligations is not germane to their qualification to participate in elections.

108.    SB7066 would keep Plaintiffs in limbo and deprived of the right to vote for election after election—often for life—based solely on their lack of wealth, an arbitrary and unconstitutional distinction.

109.    SB7066 serves no legitimate state purpose because it disenfranchises Plaintiffs solely due to inability to pay their LFOs, a distinction not at all connected to participation in elections.

110.    For those who cannot pay, disenfranchisement will not foster their payment.

111.    Denying the right to vote does not and cannot incentivize payment of LFOs that a person cannot pay.

### COUNT THREE

**Fourteenth Amendment to the U.S. Constitution,
as enforced by 42 U.S.C. § 1983
Unconstitutional Burden on the Fundamental Right to Vote**

112.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

113.    The Fourteenth Amendment safeguards the "precious" and "fundamental" right to vote, *Harper*, 383 U.S. at 670, and prohibits any encumbrance on the right to vote that is not adequately justified by valid and specific state interests, *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983).

114.    Courts reviewing a challenge to a law that burdens the right to vote "must weigh 'the character and magnitude of the asserted injury to the right[]'" to vote "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those

interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789).

115.    Plaintiffs are registered voters and have the fundamental right to vote.

116.    Defendants confirmed Plaintiffs' eligibility to vote and added Plaintiffs to the registration rolls.

117.    As an eligible registered voter, Mr. Gruver voted in the March 2019 Gainesville municipal election.

118.    As an eligible registered voter, Mr. Ivey voted in the March and May 2019 Duval County elections.

119.    As an eligible registered voter, Pastor Tyson voted in March and April 2019 Tampa municipal elections.

120.    SB7066 imposes a severe burden on Plaintiffs' right to vote. Plaintiffs will be completely, and likely permanently, disenfranchised by Fla. Stat. §§ 98.0751(1)–(2)(a).

121.    The severity of SB7066's burden is heightened because the barrier to the franchise disparately affects those citizens who are already among the most vulnerable: people with a past conviction who lack the means to pay outstanding LFOs.

122.    Plaintiffs' disenfranchisement under SB7066 does not serve any of the rationales advanced by the Legislature to justify passage, or any other legitimate state interest.

123.    Disenfranchising Plaintiffs does not serve to collect debt because SB7066 cannot incentivize payment of a debt that Plaintiffs cannot afford to pay.

124.    It is unconstitutionally burdensome for the state to condition Plaintiffs' fundamental voting rights on their ability to pay the entirety of their LFOs, which they are unable to pay.

125.    In addition, due to the lack of accurate, centralized information on outstanding LFOs, it is difficult—if not impossible—for potential registrants to determine whether their debt would disqualify them under SB7066.

126.    In order to determine their eligibility, Plaintiffs would have to contact numerous agencies and conduct research of court records. Even with these efforts, it may be impossible for many to determine their eligibility.

127.    SB7066 thereby places an unnecessary burden on the right to vote without advancing a valid state interest.

## COUNT FOUR

### Twenty-Fourth Amendment to the U.S. Constitution,
### as enforced by 42 U.S.C. § 1983
### Unconstitutional Poll Tax

128.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

129.    SB7066 violates the prohibition against poll taxes enshrined in the Twenty-Fourth Amendment.

130.    The Twenty-Fourth Amendment guarantees that the right to vote "shall not be denied or abridged . . . by reason of failure to pay any poll tax or other tax." U.S. Const. Am. XXIV.

131.    SB7066 requires LFO payment as a condition for exercising the right to vote and without regard to whether Plaintiffs are able to pay.

132.    SB7066 excludes returning citizens with outstanding restitution obligations from all means of restoration. Returning citizens cannot apply for restoration through clemency unless they have completed their restitution obligations. Bd. of Exec. Clemency, Rule 9.A. The Florida Supreme Court understood Amendment 4 to limit the Clemency Board's case-by-case restoration review to "only for those persons convicted of murder or felony sexual offenses, rather than for all felony offenders[.]" Advisory Opinion to the Attorney General, 215 So. 3d at 1207.

60

133.    Excluding Plaintiffs entirely from any chance at restoration imposes
an unconstitutional poll tax on Plaintiffs and other returning citizens.

## COUNT FIVE

**Fourteenth Amendment to the U.S. Constitution,
as enforced by 42 U.S.C. § 1983
Vagueness and Violation of Procedural Due Process**

134.    Plaintiffs re-allege and incorporate by reference each allegation
contained in the preceding paragraphs as though fully set forth herein.

135.    A law is unconstitutionally vague in violation of the Due Process
Clause if it either (1) "fails to provide people of ordinary intelligence a reasonable
opportunity to understand what conduct it prohibits," *Hill v. Colorado*, 530 U.S.
703, 732 (2000), or (2) fails to "provide explicit standards for those who apply" the
law such that "arbitrary and discriminatory enforcement" is authorized or even
encouraged, *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). *See also
League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1160–61
(N.D. Fla. 2012) (finding a "virtually unintelligible" voter registration regulation
that is accompanied by substantial penalties is void for vagueness).

136.    Florida lacks any accurate or centralized data on outstanding LFOs
that prospective voter registrants may access.

137.    Officials from Florida agencies tasked with implementation of Amendment 4 have testified that they do not have sufficient information to carry out SB7066's requirements.

138.    Without a centralized, up-to-date database, returning citizens are often unaware of whether they have any outstanding LFOs or how much LFO debt they owe.

139.    For example, Mr. Ivey has outstanding LFOs incurred more than 15 years ago but was unaware of the remaining debt until a reporter informed him of it in 2019.

140.    Mr. Mitchell had outstanding LFOs incurred over a decade ago when he was a juvenile, but was unaware of the debt until the Miami-Dade Clerk of Court sent him a notice of the debt at his registration address soon after he registered to vote.

141.    Mr. Tyson incurred his LFOs decades ago, but only became aware that some were outstanding after being notified recently by counsel.

142.    Though SB7066 specifies that returning citizens need only repay LFOs that were originally imposed by a court as part of sentence, returning citizens may not be able to tell whether outstanding LFOs fall into this category. Charges, including interest, collection fees, and other assessments charged after the fact, are not disaggregated by the courts.

143.    Furthermore, while SB7066 delineates LFOs in terms of the type of fines, fees, and restitution incurred and owed for offenses adjudicated in Florida courts, it provides no information or guidance on analogous financial obligations or civil debt incurred in other states that would be disqualifying for purposes of SB7066.

144.    SB7066 violates procedural due process by failing to provide prospective registrants sufficient information or fair warning regarding whether LFOs continue to disqualify them from voting. The absence of this information impermissibly chills Plaintiffs' exercise of their fundamental right to register and vote.

145.    SB7066 violates procedural due process by failing to provide any standards or factors under which an SOE can "verify and make a final determination . . . regarding whether the person who registers to vote is eligible pursuant to [Amendment 4] and this section," therefore ensuring arbitrary and discriminatory enforcement. Fla. Stat. § 98.0751(3)(b) (2019).

146.    SB7066 violates procedural due process by failing to provide any standards or factors under which a prospective voter registrant would be able to seek, or a court would grant, termination of LFOs or conversion to community service hours pursuant to Fla. Stat. § 98.0751(2)(a)(5)(e)(II–III), therefore ensuring arbitrary and discriminatory enforcement.

147.   SB7066 violates procedural due process by failing to provide any mechanism or standard by which a prospective registrant would be able to appeal an adverse determination on a request for termination of financial obligations or conversion to community service.

148.   SB7066 violates procedural due process by failing to provide any process for individuals with convictions in other states to seek waiver, termination, or conversion to community service.

## COUNT SIX

### First and Fourteenth Amendments to the U.S. Constitution, as enforced by 42 U.S.C. § 1983
### Burden on Core Political Speech and Associational Rights

149.   Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

150.   LWVF has a First Amendment right to speak, associate, and act collectively with others in order to register voters.

151.   LWVF cannot determine whether many potential registrants have satisfied their LFOs. LWVF volunteers do not have access to state data to help potential registrants determine whether all terms of their sentences are complete. Some volunteers will not engage in registration activities because of their concerns.

152.    SB7066 also limits the ability of individual Floridians, without specialized training, to assist returning citizens with registering to vote, a civic service that many of LWVF's members and volunteers have routinely performed of their own accord.

153.    SB7066 thus violates LWVF's constitutional rights to speech and association because the law deters LWVF from engaging in protected voter registration activity. The law prevents LWVF from registering returning citizens who are in fact eligible to vote because LWVF volunteers lack certainty that registrants can affirm that they have completed all terms of their sentences.

154.    The success of LWVF's voter registration drives is severely undermined by uncertainty as to whether a potential registrant has satisfied all LFOs imposed as part of a criminal sentence.

155.    As alleged above, SB7066 does not advance any legitimate, much less compelling, state interest.

## COUNT SEVEN

### Article I, § 10 of the U.S. Constitution,
### as enforced by 42 U.S.C. § 1983
### Retroactive Punishment in Violation of Ex Post Facto Clause

156.    Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

157.    Article 1, Section 10, of the United States Constitution provides that "[n]o state shall . . . pass any . . . ex post facto law" that retroactively punishes or extends sanctions imposed on any citizen.

158.    Plaintiffs were each convicted of crimes prior to the passage of SB7066.

159.    Plaintiffs' voting rights were automatically restored by Amendment 4 on January 8, 2019.

160.    Plaintiffs were registered to vote pursuant to Article VI, Section 4 of the Florida Constitution prior to the enactment of SB7066.

161.    SB7066's requirement of full payment of all LFOs despite inability to pay is punitive in both intent and effect.

162.    State lawmakers referenced the punitive purpose of LFOs in debate and discussion over SB7066. For instance, House sponsor Representative Grant referred to "fines, fees, [and] court costs" as "punishment for a crime." Apr. 4 Hearing at 2:58. In announcing his decision to sign the bill, Gov. DeSantis stated that, "The only reason you're paying restitution is because you were convicted of a felony." News Service of Florida, *Amendment 4 Bill: DeSantis Says He's Ready to Sign*, Tampa Bay Times (May 8, 2019), https://www.tampabay.com/florida-politics/buzz/2019/05/08/amendment-4-bill-desantis-says-hes-ready-to-sign/?template=amp/.

163.     Florida's felony disenfranchisement law has been used for nearly two centuries as a form of criminal punishment.

164.     The sanction of disenfranchisement involves an affirmative restraint on Plaintiffs' right to vote. There is no alternative, non-punitive purpose for disenfranchising individuals who are unable to pay.

165.     SB7066 imposes and extends punitive sanctions on Plaintiffs in violation of the Ex Post Facto Clause.

## COUNT EIGHT

**Fourteenth and Fifteenth Amendments to the U.S. Constitution,
as enforced by 42 U.S.C. § 1983
Intentional Race Discrimination**

166.     Plaintiffs re-allege and incorporate by reference each allegation contained in the preceding paragraphs as though fully set forth herein.

167.     The Equal Protection Clause of the Fourteenth Amendment prohibits intentional discrimination on the basis of race. U.S. Const. amend. XIV. The Fifteenth Amendment forbids the denial or abridgment of the right to vote on account of race or ethnicity. U.S. Const. amend. XV. Both constitutional protections guard against any deprivation of the right to vote that is motivated by race. *Rogers v. Lodge*, 458 U.S. 613, 621–25 (1982).

168.     Because a discriminatory motive may hide behind legislation that "appears neutral on its face," the U.S. Supreme Court articulated several non-

exhaustive factors to inform an analysis of discriminatory intent: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–28 (1977).

169.    An official action taken for the purpose of discriminating on account of race has no legitimacy under the U.S. Constitution. *City of Richmond, Va. v. U.S.*, 422 U.S. 358, 378–79 (1975).

170.    Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265. Instead, the plaintiff's burden is to show that the discriminatory purpose was a motivating factor, rather than the primary or sole purpose. *Id*. at 265–66.

171.    Applying the *Arlington Heights* factors to the evidence reveals that SB7066 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black returning citizens in violation of the U.S. Constitution.

172.    The history underlying Florida's felony disenfranchisement regime, the known and reasonably foreseeable discriminatory impact of SB7066, the

sequence of events and substantive departures from the normal legislative process which resulted in the enactment of SB7066, and the tenuousness of the stated justifications for SB7066 raise a strong inference of a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments.

## **REQUEST FOR RELIEF**

WHEREFORE Plaintiffs respectfully request the following relief:

a) Declare Fla. Stat. §§ 98.0751(1)–(2)(a), as amended by SB7066, unconstitutional in derogation of the First, Fourteenth, Fifteenth, and Twenty-Fourth Amendments and the Ex Post Facto Clause of the United States Constitution;

b) Temporarily, preliminarily, and permanently restrain and enjoin the State of Florida from enforcing the provision of Fla. Stat. §§ 98.0751(1)–(2)(a);

c) Award Plaintiffs' attorneys' fees in this action pursuant to 42 U.S.C. § 1988(b);

d) Award Plaintiffs their costs of suit; and

e) Grant such other and further relief as this Court deems just and proper in the circumstances.

Dated: June 28, 2019                    Respectfully Submitted,

                                        /s/ *Julie A. Ebenstein*
                                        Julie A. Ebenstein (Fla. Bar No. 91033)

R. Orion Danjuma*
Jonathan S. Topaz*
Dale E. Ho*
American Civil Liberties Union
Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7332
Fax: (212) 549-2654
jebenstein@aclu.org
odanjuma@aclu.org
jtopaz@aclu.org
dho@aclu.org

Daniel Tilley (Fla. Bar No. 102882)
Anton Marino*
American Civil Liberties Union of
Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
amarino@aclufl.org

Jimmy Midyette (Fla. Bar No. 0495859)
American Civil Liberties Union Foundation
of Florida
118 W. Adams Street, Suite 510
Jacksonville, FL 32202
904-353-8097
jmidyette@aclufl.org

Leah C. Aden*
John S. Cusick*
NAACP Legal Defense and Educational
Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

laden@naacpldf.org
jcusick@naacpldf.org

*and*

Wendy Weiser
Myrna Pérez
Sean Morales-Doyle*
Eliza Sweren-Becker*
Brennan Center for Justice at NYU
School of Law
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
wendy.weiser@nyu.edu
myrna.perez@nyu.edu
sean.morales-doyle@nyu.edu
eliza.sweren-becker@nyu.edu

*Counsel for Plaintiffs*

* *pro hac vice* applications forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2019, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

Additionally, the parties are concurrently being served via email and physical service of summons and complaint at the following addresses:

KIM A. BARTON, In her Official Capacity as
Alachua County Supervisor of Elections
Josiah T. Walls Building
515 North Main St., Suite 300
Gainesville, FL 32601
*kbarton@alachuacounty.us*

PETER ANTONACCI, in his Official Capacity as
Broward County Supervisor of Elections
115 S. Andrews Ave.
Room 102
Fort Lauderdale, FL 33301
*elections@browardsoe.org*

MIKE HOGAN, In his Official Capacity as
Duval County Supervisor of Elections
105 E. Monroe St.
Jacksonville, FL 32202
*mhogan@coj.net*

CRAIG LATIMER, In his Official Capacity as
Hillsborough County Supervisor of Elections
Fred B. Karl County Center,
601 E. Kennedy Blvd., 16th Floor
Tampa, FL 33602
*Voter@hcsoe.org*

LESLIE ROSSWAY SWAN, In her Official Capacity as
Indian River County Supervisor of Elections
4375 43rd Ave.
Vero Beach, FL 32967
*Info@voterindianriver.com*

MARK EARLEY, In his Official Capacity as
Leon County Supervisor of Elections
2990-1 Apalachee Parkway,
Tallahassee, FL 32301
*Vote@LeonCountyFL.gov*

MICHAEL BENNETT, In his Official Capacity as
Manatee County Supervisor of Elections
600 301 Boulevard, W., Suite 108
Bradenton, FL 34205
*Info@votemanatee.com*

CHRISTINA WHITE, In her Official Capacity as
Miami-Dade County Supervisor of Elections
2700 NW 87 Ave.
Miami, FL 33172
*soedade@miamidade.gov*

BILL COWLES, In his Official Capacity as
Orange County Supervisor of Elections
119 West Kaley St.
Orlando, FL 32856
*voter@ocfelections.com*

RON TURNER, in his Official Capacity as
Sarasota County Supervisor of Elections
Terrace Building
101 South Washington Blvd.
Sarasota, FL 34236
*rturner@sarasotavotes.com*

LAUREL M. LEE, In her Official Capacity as
Secretary of State of Florida
Florida Department of State

R.A. Gray Building
500 South Bronough St.
Tallahassee, Florida 32399-0250
*secretaryofState@DOS.MyFlorida.com*
*DOS.GeneralCounsel@DOS.MyFlorida.com*

ASHLEY MOODY, In her Official Capacity as Attorney
General of Florida
Office of Attorney General
State of Florida
The Capitol PL-01
Tallahassee, FL 32399-1050
*oag.civil.eserve@myfloridalegal.com*

/s/ Julie A. Ebenstein
Julie A. Ebenstein (Fla. Bar No. 91033)
American Civil Liberties Union
Foundation, Inc.
Voting Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7332
Fax: (212) 549-2654
jebenstein@aclu.org